[Civ. No. 22056. Fourth Dist., Div. One. Sept. 24, 1981.]

DEL MAR BEACH CLUB OWNERS ASSOCIATION, INC.,
Plaintiff and Appellant, v.
IMPERIAL CONTRACTING COMPANY, INC., et al., Defendants
and Respondents.

COUNSEL

Belcher, Henzie & Biegenzahn, William I. Chertok and Uzzell S. Branson III for Plaintiff and Appellant.

Morris, Polich & Purdy, Michael M. Edwards, Stanley Wezelman, Higgs, Fletcher & Mack, Thomas E. Miller, Gregg C. Sindici,

Marinos, Styn & Studebaker, Jeffrey N. Garland, Bernard A. Newell, Jr., Thomas Grady and George W. Kraft, Jr., for Defendants and Respondents.

OPINION

**WEINER, J.**—Plaintiff, Del Mar Beach Club Owners Association, Inc. (Association) appeals judgments of dismissal in favor of all defendants.

The principal questions are whether the Association, created to acquire and hold title to property included in a planned development pursuant to Business and Professions Code section 11003 has standing to maintain this action, and if so, whether it can state a cause of action for strict liability against defendants as "manufacturers" of retail housing.

As we will explain, we conclude the Association has standing and has stated a cause of action for strict liability against the developer-builder of the project. We also decide the Association cannot state a cause of action for strict liability against the architects and engineers. We dispose of the judgments accordingly.

*General and Procedural Background*

Before discussing the procedural history, it may be helpful to first identify the participants and to describe the commercial setting giving rise to this litigation.

Association is the managing entity and owner of land and buildings of the Del Mar Beach Club, a planned development (see Bus. & Prof. Code, § 11003), consisting of approximately 192 units located on a scenic bluff overlooking the ocean at Solana Beach, California. The Beach Club was developed and built from about August 1970 through the early part of 1973, pursuant to the terms of Del Mar Venture (Venture), a joint venture agreement between Imperial Contracting Co., Inc. (Imperial), a licensed general contractor, and Rebma California Nine, Inc.

(Rebma), a real estate investment company. Imperial was the general contractor for the project; Rebma provided the financial backing. In addition to the living units, the development consists of a clubhouse, swimming pool, parking structure and tennis courts. During the relevant period of planning and construction, Thomas M. Kelly was the president, director, and principal shareholder of Imperial. Tragically, he and his wife were killed in an airplane crash on February 16, 1979. Gary Adcock, a licensed real estate broker, was an officer, director, and shareholder of Imperial and director of the Association until August 1973. William S. Krooskos and Associates (Krooskos), Arevalo and Safino of San Diego, Inc. (Arevalo and Safino), and Wolfe-Woods and Associates, Inc. (Wolfe-Woods), were respectively the soil engineers, structural engineers and architects on the project.

The Beach Club was built in three phases. In November 1972, after completion of the first two stages, erosion problems began to develop on the sea front bluff, a common area, along the western edge of the project. The Association says that actual disbursements for design and construction to prevent further erosion exceed $1.1 million with total damages to exceed $1.6 million. The Association also claims defects in the third phase of the project, Del Mar Beach Club East, pertaining to the grading, paving and installation of decking, parking structures and tennis courts, have caused damages in excess of $178,000.

When negotiations to amicably resolve the problems proved fruitless, the Association sued Imperial, Rebma and Del Mar Venture. This original complaint, filed on July 8, 1975, alleged three causes of action for negligence, breach of contract and declaratory relief. The procedural metamorphosis of this complaint into a fourth amended complaint filed January 31, 1979, is not particularly relevant. That complaint, the pleading before us, contains the same causes of action as the original complaint plus a cause of action sounding in strict liability regarding the bluff-related defects and negligence and strict liability regarding the additional defects within the third phase of the project. Arevelo and Safino, Wolfe-Woods and Krooskos are also named as defendants and theories of alter ego are now alleged against Kelly and Adcock.

Demurrers and motions to strike by Imperial, Venture, Kelly and Adcock were sustained without leave to amend on the grounds the Association lacked standing to sue and could not state a cause of action on strict liability. The remaining defendants successfully moved for judgments on the pleadings. This appeal followed.

## Standing

■ Code of Civil Procedure section 367 requires that "[e]very action must be prosecuted in the name of the real party in interest, except as provided in Sections 369 and 374 of this code." Generally, "the person possessing the right sued upon by reason of the substantive law is the real party in interest." (*Powers* v. *Ashton* (1975) 45 Cal.App.3d 783, 787 [119 Cal.Rptr. 729]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 93, pp. 1768-1770.) ■ In order to state a cause of action for injury to real property, plaintiff's ownership, lawful possession, or right to possession, of the property must be alleged. (*Friendly Village Community Assn. Inc.* v. *Silva & Hill Constr. Co.* (1973) 31 Cal.App.3d 220, 224 [107 Cal.Rptr. 123, 69 A.L.R.3d 1142]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 499, 500, p. 2159.)

At oral argument defendants admitted the major problem here was not with the theoretical aspect of plaintiff's standing, but whether standing was properly alleged. Defendants argued that a trial court does not abuse its discretion in sustaining a demurrer without leave to amend where a plaintiff files five different pleadings over a four-year period, each of which is defective.

■ Defendants correctly acknowledge plaintiff's theoretical status. Unlike the typical planned development under Business and Professions Code section 11003, the Association here acquired title to not only the customary "common areas," but pursuant to the declaration of restrictions recorded May 16, 1971, it also acquired title to the real property and structures. In other words, the individual owners only purchased the "air space" units within the apartment buildings and not the buildings and the land underlying them. Clearly, under such circumstances, the Association as *owner* has standing.[1]

In addition to the Association's standing as owner, we also conclude the Association may maintain this action in a representative capacity on behalf of its members.

---

[1]In light of our disposition, we do not address the question of whether Code of Civil Procedure section 374, which was amended effective January 1, 1980, to expressly include associations organized under Business and Professions Code section 11003, may be applied retroactively. (See *Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 791-793 [171 Cal.Rptr. 334].)

Article VI, sections 6.2 and 6.2.13 of the incorporated declarations of restrictions provides:

"6.2 The Association has and shall have the following rights and duties:

". . . . . . . . . . . . . .

"6.2.13 To prosecute or defend, under the name of the Association, *any action affecting or relating to the Common Areas* or the personal property owned by the Association, *or any action which all of the Owners have an interest in the subject of the action* or in whom any right to relief in respect to or arising out of the same transaction or series of transactions is alleged to exist." (Italics supplied.)

Code of Civil Procedure section 382 provides in part that "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue . . . for the benefit of all." "The section is based upon the equitable doctrine of virtual representation which "'rests upon considerations of necessity and paramount convenience, and was adopted to prevent a failure of justice.'" [Citations.]" (*Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 703-704 [63 Cal.Rptr. 724, 433 P.2d 732].)

Courts now eschew a rigid or formal application of the statute particularly where the subject involves a matter of public interest. (See *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal. App.3d 117, 122 [109 Cal.Rptr. 724].) There is no particular policy interest to be served, however, by requiring a different interpretation of the statute when the public nature of the issues may be less significant than the financial interests of the parties. Here, where the Association's obligations under the declaration of restrictions are well defined and where it has sustained actual damages as owner, there is no question but that it has, and does intend, to fairly and adequately represent the interests of the individual unit owners, members of the Association. (See *Salton City, etc. Owners Assn.* v. *M. Penn Phillips Co.* (1977) 75 Cal.App.3d 184, 190 [141 Cal.Rptr. 895].) Because damage to the common areas, such as walkways and stairs, affect all the unit owners, it is not only logical that the common questions of law and fact be resolved in one proceeding, but that it is judicially economical and cost beneficial to do so. In light of the provisions of the declarations of re-

strictions and the considerations, equitable and practical, underlying the doctrine of permitting representative actions, we hold the Association may maintain this suit in a representative capacity on behalf of its members. (See *Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co., supra,* 114 Cal.App.3d at pp. 793-796.)

■ We must still answer, however, the more difficult questions of the adequacy of the pleadings and abuse of trial court discretion in failing to grant leave to amend.

The Association attached the declaration of restrictions to the fourth amended complaint as an exhibit with its terms incorporated by reference into the pleading. The Association specifically alleged it could prosecute the action on behalf of the owners because of the authority given to it under the declaration. Defendants argue this type of pleading is defective because material facts comprising a substantive cause of action cannot be pleaded by simple reference to an exhibit attached to the complaint. (See 49 Cal.Jur.3d, Pleading, § 59, p. 427.) We conclude otherwise.

The Association, by reference to the attached exhibit, clearly and directly incorporated the declaration of restrictions in its entirety as it pertained to standing. The incorporated restrictions defining a unit as an "air space" and prohibiting the owner from altering or modifying a wall within the acquired unit without first obtaining approval of such alteration or modification from the Association are sufficient allegations of ownership interest in the Association. (See *Holly Sugar Corp.* v. *Johnson* (1941) 18 Cal.2d 218, 225-227 [115 P.2d 8]; *Klein* v. *Farmer* (1945) 70 Cal.App.2d 51, 59-60 [160 P.2d 30]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 321, 322, pp. 1989-1991; 1 Chadbourn, Cal. Pleading (1961) § 836, pp. 761-765.) In light of our obligation to construe pleadings liberally with a view to attaining substantial justice among the parties, we conclude the pleadings adequately allege standing to withstand a general demurrer. (See *King* v. *Central Bank* (1977) 18 Cal.3d 840, 843 [135 Cal.Rptr. 771, 558 P.2d 857].)

We are mindful, however, that a trial court need not have infinite patience in dealing with an inept pleader. Here, the size of the file and the timing of the demurrer occurring shortly before trial are suggestive of a cavalier attitude on plaintiff's part in prosecuting this action. Upon further inquiry, this inference is unsupported.

Complex litigation involving several actively pleading defendants is necessarily time-consuming. It is inevitable the file will become heavily laden and the pleading aspect of the case will continue over a rather long period of time. With defense cross-complaints, continuances and multiple demurrers not challenging standing until the fourth amended complaint, the delay here within the pleading stage is not solely attributable to the Association. With these considerations in mind and in light of the strong policy of deciding cases on their merits, we conclude it was an abuse of discretion to sustain the demurrers without leave to amend. (See *Minsky* v. *City of Los Angeles* (1974) 11 Cal.3d 113, 118 [113 Cal.Rptr. 102, 520 P.2d 726]; *Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 549-550 [99 Cal.Rptr. 745, 492 P.2d 1137]; *Jensen* v. *Royal Pools* (1975) 48 Cal.App.3d 717, 722 [121 Cal.Rptr. 805].)

The interests we have balanced also include the troubling issue of apparent unfairness to Kellys' beneficiaries caused by perpetuating this litigation. Now the closing of those estates will be deferred until the case is concluded. Unfortunately, the prejudice here is similar to that sustained in any case when an important party unexpectedly dies pending trial and before adequate discovery can be completed. As sympathetic as we may be to this problem, we may not use it as justification to deprive plaintiff of its day in court.

*Strict Liability*

The doctrine of strict liability was adopted in this state in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62, 64 [27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], where our Supreme Court held in pertinent part:

"A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. . . . [¶] To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the . . . [article] in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the . . . [article] unsafe for its intended use." Although the early progeny of this landmark decision held the doctrine inapplicable to real property (*Conolley* v. *Bull* (1968) 258 Cal.App.2d 183, 195 [65 Cal.Rptr. 689]; *Halliday* v. *Greene* (1966) 244 Cal.App.2d 482, 485 [53 Cal.Rptr. 267]), more recent cases

have eroded this distinction. In *Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 226-229 [74 Cal.Rptr. 749], the court held that the doctrine may be applied to a builder-developer of mass-produced homes for a defectively installed radiant heating system. In *Avner v. Longridge Estates* (1969) 272 Cal.App.2d 607, 609-615 [77 Cal.Rptr. 633], the court concluded the manufacturer of a lot for building purposes (by cutting, filling, grading, compacting, etc.) may be held strictly liable in tort for damages suffered by the owner as a proximate result of any defects in the manufacturing process. (*Id.,* at p. 615.) In *Stuart v. Crestview Mut. Water Co.* (1973) 34 Cal.App.3d 802, 811 [110 Cal. Rptr. 543], a developer who installed a defective water distribution system could be held strictly liable for property damage caused by the system, although the system was not on the plaintiffs' properties. In *Hyman v. Gordon* (1973) 35 Cal.App.3d 769, 772-773 [111 Cal.Rptr. 262], it was further held a homebuilder may be held strictly liable "where, as the proximate result of a defect in the design of a residential building, and installation of an article pursuant thereto, injury results to a human being." (*Id.,* at p. 773.) Of pertinence here, the court stressed that "[i]t is possible that an article . . . may function safely in one location in the design but not another." (*Ibid.*) Finally, in *Golden v. Conway* (1976) 55 Cal.App.3d 948, 961-962 [128 Cal.Rptr. 69], the court held that

"a lessor of real property who, . . . is engaged in the business of leasing apartments and appurtenant commercial premises, equips the premises with an [article] without knowing whether . . . it is defective because of the manner in which it was manufactured or installed, and it proves to have defects which cause injury to persons or property when used in a normal manner, is strictly liable in tort." (See also *Berman v. Watergate West, Inc.* (D.C. 1978) 391 A.2d 1351, 1357-1358, and cases cited; *Worrell v. Barnes* (1971) 87 Nev. 204 [484 P.2d 573, 575-576].)

The case before us is substantively "indistinguishable in principle" from the foregoing cases. (*Stuart v. Crestview Mut. Water Co., supra,* 34 Cal.App.3d at p. 810.) In extending the doctrine to real property, the *Kriegler* court aptly noted:

"We think, in terms of today's society, there are no meaningful distinctions between . . . [the] mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same. Law, as an instrument of justice, has infinite capacity for growth to meet changing needs and mores. No-

where is this better illustrated than in the recent developments in the field of products liability. The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping legal principles abreast of the times. Ancient distinctions that make no sense in today's society and that tend to discredit the law should be readily rejected ...." (269 Cal.App.2d at p. 227.)

The court then explained:

"'When a vendee buys a development house from an advertised model, as in a ... project, he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible. If there is improper construction such as a defective heating system or a defective ceiling, stairway and the like, the well-being of the vendee and others is seriously endangered and serious injury is foreseeable. The public interest dictates that if such injury does result from the defective construction, its cost should be borne by the responsible developer who created the danger and who is in the better economic position to bear the loss rather than by the injured party who justifiably relied on the developer's skill and implied representation.

"'Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselvs [sic] in the deed than are automobile purchasers in a position to protect themselves in the bill of sale.'" (269 Cal.App.2d at p. 228, quoting *Schipper* v. *Levitt & Sons, Inc.* (1965) 44 N.J. 70 [207 A.2d 314, 325-326].)

■ Guided by these considerations, we can perceive of no overriding reason why the doctrine should not apply here. Although this case does not involve the mass-production of tract houses, it does involve a multiple-unit, residential, planned development complex which consists of 192 units with 27 residential buildings as well as parking structures and recreational facilities. Each purchaser of a dwelling unit equally relied upon the developer's skill and implied representation the project was

erected in a workmanlike manner and reasonably fit for continued habitation. The members did not have an opportunity to participate in the design or construction of the project. The individual units appear to fit the classic mold of buyers of mass-produced housing.

Regarding the bluff-related defects, the Association alleges in its complaint that the defendants designed, developed and constructed the improvements on the subject real property for sale to the general public, and in fact advertised and sold the residential units to the public. It further alleges the nature and effects of the defective condition of the erosion, explaining that it is the result of the natural condition of the bluff and the improvements as defectively designed and constructed by the defendants. The Association further alleges the defective condition was not known to the purchasers and not reasonably discoverable, as well as that these circumstances were known to the defendants. Finally, the Association asserts the resulting damages were proximately caused by the foregoing, as the unit purchasers utilized the property for the use it was designed, developed and in a manner reasonably foreseeable by defendants.

Relying on *Avner* v. *Longridge Estates, supra*, 272 Cal.App.2d 607, the defendants urge the Association cannot state a cause of action because they purchased merely one parcel of land upon which they constructed a planned unit development. They further argue that the complaint is devoid of any allegations they were engaged in a continuous course of business in selling or furnishing any product or that they manufactured the realty in dispute.

Liberally construing the cited allegations, the Association has stated facts sufficient to constitute a cause of action sounding in strict liability. We have already rejected the defendants' asserted distinguishing factor of a planned development versus a mass-produced subdivision development. In light of the size of the project involved and the defendant developers' construction and marketing of the 192 units, the inference that Rebma, Venture, Imperial and its principals were engaged in the business of developing and selling residential units, rather than merely being occasional sellers who are not engaged in that activity as part of a business venture, is inevitable. (See *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 254 [85 Cal.Rptr. 178, 466 P.2d 722]; *Hyman* v. *Gordon, supra*, 35 Cal.App.3d at pp. 773-774; Rest.2d Torts, § 402A.) The predominant flaw, however, of the defendants' challenge is their misunderstanding of what underlies the Association's cause of action. Plaintiff's

cause of action is not solely predicated upon the manufacturing of a lot for building purposes as in *Avner*, although undoubtedly some preparatory molding of the realty was necessary before constructing the project. Through a merger of the principles within the progeny of *Kriegler*, strict liability here lies in the defective design and construction of the multi-unit residential project upon the *location* of an unstable bluff. (See generally, *Hyman v. Gordon, supra*, 35 Cal.App.3d at pp. 772-773; *Stuart v. Crestview Mut. Water Co., supra*, 34 Cal. App.3d at p. 811.)[2]

By incorporation by reference, the Association also alleges the necessary facts to state a cause of action for strict liability regarding the additional defects within the third phase of the project and the recreational areas. Specifically, the Association listed as other defects: the cracking, chipping and peeling of the tennis court surfaces; the rusting and corroding of exterior railings and guardrails; the sinking of the pavement on the east side of the pool; the death of several trees; the subsiding of the grading and paving on the eastern portion of the realty; the leaking of water within the garage and miscellaneous stairwells; and, the rusting and corroding of numerous door and window sills throughout the units. The Association then alleges that these defects "were proximately caused by the negligent design, specification, testing, surveying, planning, selecting, installing, grading, paving, supervision, and/or construction of the . . . improvements by defendants . . . ."

Defendants contend the Association cannot state a cause of action in strict liability for the alleged defects since they pertain to designed and constructed recreational and common area facilities within the project, and not part and parcel of the mass-produced planned units. We disagree for we find the analogy of the common water distribution system within *Stuart v. Crestview Mut. Water Co., supra*, to be persuasive.[3]

---

[2]Other jurisdictions have not extended the doctrine of strict liability to buildings; concluding that a condominium unit (*Heller v. Cadral Corp.* (1980) 84 Ill.App.3d 677 [406 N.E.2d 88]) a multi-level open garage (*Lowrie v. City of Evanston* (1977) 50 Ill. App.3d 376 [365 N.E.2d 923]) a sheltered-care facility (*Immergluck v. Ridgeview House, Inc.* (1977) 53 Ill.App.3d 472 [368 N.E.2d 803]) and a silo (*Cox v. Shaffer* (1973) 223 Pa.Super. 429 [302 A.2d 456]) do not constitute products within the doctrine of strict liability.

[3]Defendants also assert that because the project is composed of air space units with title to the land and improvements in the Association, it has consequently never been placed on the market for sale to the general public. Guided by the *Kriegler* quote, *ante*, regarding the evolution of the law and its continual quest to stay abreast with the changing times and be responsive to the changing needs and mores of our society, we conclude that under the instant facts the planned development, composed of 27 build-

■ Although the Association has stated two causes of action for strict liability against the remaining defendant developer-builders (Venture, Imperial, Kelly and Adcock) (*Swett v. Gribaldo, Jones & Associates* (1974) 40 Cal.App.3d 573, 575 [115 Cal.Rptr. 99]), it cannot, however, state such a cause of action against Krooskos & Associates (soils engineers), Arevalo & Safino (structural engineers), and Wolfe-Woods (architects). (*Id.*, at pp. 575-576; *Stuart v. Crestview Mut. Water Co., supra,* 34 Cal.App.3d at pp. 811-812; *Allied Properties v. John A. Blume & Associates* (1972) 25 Cal.App.3d 848, 856 [102 Cal.Rptr. 259].) For, it is settled that "those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct." (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15].)

*Fraud*

■ The Association finally contends the trial court erred in denying it leave to amend its third amended complaint to state a cause of action for fraud.

Granted, there exists a liberal policy toward permitting amendments at any time under Code of Civil Procedure section 473, but when the trial court denies the request, its decision will be upheld on appeal unless a clear abuse of discretion is established. (*People ex rel Dept. Pub. Wks. v. Jarvis* (1969) 274 Cal.App.2d 217, 222 [79 Cal.Rptr. 175]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 1040, 1042, pp. 2618-2621.) In denying leave to amend, the trial court may properly consider whether the subject matter of the amendment is objectionable, the conduct of the moving party, and the belated presentation of the amendment. (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 1044-1050, pp. 2621-2627.)

The trial court expressed its ruling in the alternative, reasoning that the Association did not have standing to assert the fraud claim and, even if it did, it had not been diligent in so doing to the prejudice of the defendants. We need not address the former, because the record amply

---

ings housing 192 units, was indeed placed on the market for sale in divided interests to the general public. Each purchaser of a dwelling unit obtained not only a proprietary possessary interest in the air space unit, but also a nonexclusive easement for ingress, egress and support throughout the common areas. The structural integrity of each unit is predicated upon the structural integrity of the project in its entirety.

supports the latter. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 226, p. 4215.) In December 1979, the Association sought to plead fraud, a disfavored plea, approximately five months before trial despite its knowledge of the facts giving rise to the cause of action as early as July and September 1976, when it took the depositions of Kelly and Krooskos. Indeed, its request for leave was based upon their deposition testimony. The record is devoid of any excuse for the Association's two-and-a-half-year delay.[4] The mere substitution of retained counsel cannot excuse the delay; for, otherwise, counsel would be inevitably substituted whenever a party desired to belatedly amend its complaint. This lack of diligence prejudiced the defendants; for, had they been aware of the claim in a timely fashion, they could have properly prepared, as relevant evidence may no longer be available. Consequently, the Association has not met its burden of establishing a clear abuse of discretion.

*Disposition*

As to Imperial, Venture, Kelly and Adcock, the "judgment" of dismissal is reversed. As to Arevalo & Safino, Krooskos, and Wolfe-Woods, their respective judgments of dismissal are affirmed in part regarding the dismissal of the causes of action sounding in strict liability, but are reversed in all other respects. Each party is to bear its own costs on appeal.

Cologne, Acting P. J., and Staniforth, J., concurred.

On September 25, 1981, the judgment was modified to read as printed above.

---

[4]"The trial court is entitled to be 'skeptical of late claims' [citation]; and long-deferred presentation of a proposed amendment, without a showing of excuse for the delay, is a significant factor in support of the trial court's discretionary denial of leave to amend. [Citation.]" (*People* ex rel. *Dept. Pub. Wks.* v. *Jarvis, supra*, 274 Cal.App. 2d at p. 222; see *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 293 [136 Cal.Rptr. 603]; *Hunt* v. *Smyth* (1972) 25 Cal.App.3d 807, 828 [101 Cal.Rptr. 4].)